**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION NO. |
| v. | : | 09-cr-0260 (JCH) |
| | : | |
| OKPAKO MIKE DIAMREYAN | : | |
| | : | APRIL 16, 2010 |

**RULING RE: DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL**
**(Doc. No. 49)**

On February 16, 2010, a jury found defendant Okpako Mike Diamreyan guilty of three counts of wire fraud.  See Jury Verdict (Doc. No. 46).  Diamreyan is incarcerated and awaiting sentencing.  He now renews his Motion for a Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29(c).[1]  See Mot. for J. of Acquittal (Doc. No. 49).  For the reasons that follow, the Motion is denied.

**I.   FACTS**

The indictment charged Diamreyan with three counts of wire fraud.  Specifically, Diamreyan was charged with devising a scheme to defraud known as an "advance fee" scam, and in furtherance of that scheme used wire communications to be used.  An "advance fee" scam is one where a person asks an individual to pay an advance fee in order to obtain a larger sum of money, which the individual never receives.  The three counts of wire fraud charged in the Indictment are: Count One, a telephone call from Diamreyan in Ghana to Michael Pandelos in Connecticut on August 19, 2006; Count Two, a wire transfer via Western Union of $50 from Pandelos to Diamreyan on August

---

[1] Diamreyan made an oral Motion for a judgment of acquittal pursuant to Fed. R. Crim. P 29(a) at the close of the government's evidence.  See Oral Mot. for J. of Acquittal (Doc. No. 39).

1

22, 2006; and Count Three, a wire transfer of $100 from Pandelos to Martine Janvier, Diamreyan's wife, in Massachusetts on August 26, 2008.

At trial, the government presented evidence of the "advance fee" scam that Diamreyan perpetrated. Richard Lauria of the Defense Criminal Investigative Service testified that Diamreyan told him, during the execution of a search warrant in August 2009, that Diamreyan had used the email account "milkymyx@yahoo.com" for approximately ten years and that no one else had access to the account until 2008. The government introduced Diamreyan's visa application, filled out by the defendant, which included his email address (milkymyx@yahoo.com), telephone numbers (0245740976, 0276820246, and 0244105034), and passport number (ending in 6402A). The government also introduced Diamreyan's passport, which matched the number listed on his visa application.

Investigator Lauria then testified about email messages obtained from Diamreyan's email account through a search warrant. In these messages, Diamreyan purported to be someone who had a large sum of money in Africa, which he needed the recipient of the email to help him get out of Africa, and he offered some portion of that money to them once they helped him free it. The stories about Diamreyan's purported identity, the amount of money available, the reason it was tied up, the money needed to free it, and the name of the contact person changed from email to email, but the overall scam was the same. Frequently, Diamreyan would include his phone number (one of those listed on his visa application) in the email and ask people to contact someone by a different name at that number. For example, in one email, Diamreyan told the email recipient that he was in Sierra Leone, and his family's $23.4 million was on

consignment at the airport.  He then asked the recipient to contact the airport director,

Rev. Dr. Richard Camaro, to release the money from this consignment.  Diamreyan

gave his own phone number (the one ending in x5034) to contact Rev. Dr. Camaro.

The government introduced emails from Diamreyan to David Cotton, Mitchell

Bender, and Richard Smith.  Diamreyan contacted them using different names and

different stories, but included his own phone number (both the x5034 number and the

x0246 number).  Using his milkymyx email account, Diamreyan also sent false

documents such as certificates from the "Ministry of Finance" or photographs of large

trunks full of American currency.  In one of the emails to Bender from Diamreyan's

account, Diamreyan purports to be Dr. Michael Koffi and asks Bender to send $250 to

Mike Okpako.  Dr. Koffi lists his phone number as Diamreyan's x0246 number.  Cotton,

Bender, and Smith all testified at the trial.  Both Bender and Smith sent money to

Diamreyan via Western Union and received nothing in return.  Cotton, Bender, and

Smith all testified that the scam perpetrated upon them included both emails and phone

calls from persons alleging to be those named in the emails.

Investigator Lauria's testimony also introduced telephone and Western Union

records.  These telephone records, which originated from Diamreyan's x0246 number,

listed a call made from that number to a number in Connecticut on August 19, 2006, the

date listed in Count One of the Indictment.  The Western Union records included

several transfers between Michael Pandelos and either Martine Janvier or "Mike

Okpako," the defendant, including the two wire transfers listed in Counts Two and

Three of the Indictment.  The transfers to Mike Okpako include Diamreyan's passport

number.  Lauria testified that this passport number indicates that Diamreyan actually

3

picked up the money himself, because Western Union requires that information from the person picking up the transferred money.

The government also introduced testimony from Antje Pandelos, the wife of Michael Pandelos, the individual listed in the Indictment as a victim of Diamreyan's wire fraud. Ms. Pandelos testified about her husband's email address and his business phone number. His business phone number was the same Connecticut number listed on the phone records introduced by Lauria. A call was made from Diamreyan's x0246 number to the Pandelos' number on August 19, 2006. Ms. Pandelos testified that her husband had no legitimate business contacts in Africa after 2004, and that he had no friends or family in Africa. Ms. Pandelos testified that she sent money overseas at her husband's direction "because there were. . . promises behind it. They said they were going to work with [her] husband to secure some kind of contracts and he would be richly rewarded." Ms. Pandelos testified that she was the one making trips to the bank and to Western Union because her husband had had a stroke and could no longer make such trips. The government introduced two Western Union receipts, reflecting the wire transfers on August 22 and 26, 2006, listed in the Indictment, and Ms. Pandelos testified that her signature was on those receipts. Ms. Pandelos also identified an email from an alleged "Inspector Kofi" to her husband's email account on August 20, 2006, which directs Mr. Pandelos to send a payment "tomorrow" to "Mike Okpako." This email has written on it "Replied 8/22" and "Send second 8/24." Ms. Pandelos testified that this was written in her husband's handwriting.

The government also introduced testimony from Diamreyan's wife, Martine Janvier. She testified that Diamreyan used the milkymyx email account when she first

4

met him on the internet in 2003.  She and Diamreyan married in 2008.  Janvier testified

that she would pick up money from Western Union and MoneyGram for Diamreyan, but

that she did not know the people sending the money and believed the transactions

were legitimate.  She said that Diamreyan would sometimes tell her to send the money

along to him, but would also tell her to apply it to his bills in the United States.  She

recalled picking up the money sent by Michael Pandelos and testified that Diamreyan

told her to apply it to his phone bill.  The government also introduced an email from

Diamreyan to Janvier on August 28, asking her to pick up $100 from Western Union

from the sender Michael Pandelos and directing Janvier to hold the money for

Diamreyan until he told her what to do with it.

Finally, the government introduced testimony from Customs and Border

Protection Officer Michael Carbone.  Carbone performed a secondary inspection of

Diamreyan at Logan Airport on July 31, 2009.  Carbone testified that Diamreyan's cell

phone included text messages about Western Union and other financial transactions.

Carbone also searched Diamreyan's thumb drive, which included fraudulent, official-

looking documents such as the ones sent to Mitchell Bender and Richard Smith in their

emails with Diamreyan.

## II.    STANDARD OF REVIEW

Rule 29(a) of the Federal Rules of Criminal Procedure provides that district

courts "must enter a judgment of acquittal of any offense for which the evidence is

insufficient to sustain a conviction."  FED. R. CRIM. P. 29(a).  Rules 29(b) and (c) allow a

court to reserve the decision on the motion until after the jury returns a verdict.  See

FED. R. CRIM. P. 29.   "A defendant challenging the sufficiency of the evidence that was

5

the basis of his conviction at trial bears a 'heavy burden.'"  U.S. v. Hawkins, 547 F.3d

66, 70 (2d Cir. 2008)(quoting U.S. v. Parkes, 497 F.3d 220, 225 (2d Cir. 2007)).  In

deciding whether to grant a motion pursuant to Rule 29, the court should "view the

evidence in the light most favorable to the government, drawing all inferences in the

government's favor and deferring to the jury's assessments of the witnesses'

credibility."  Hawkins, 547 F.3d at 70.  A jury verdict shall be sustained "so long as any

rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt."  Id. (quoting Parkes, 497 F.3d at 225-6)(internal quotation marks

omitted).  "[I]f the evidence viewed in the light most favorable to the prosecution gives

equal or nearly equal circumstantial support to a theory of guilt and a theory of

innocence, then a reasonable jury must necessarily entertain a reasonable doubt."

U.S. v. Glenn, 312 F.3d 58, 70 (2d Cir. 2002)(internal quotation marks omitted).

## III.   DISCUSSION

The essential elements of a wire fraud violation are: (1) a scheme to defraud, (2)

the defendant's participation in the scheme with fraudulent intent, and (3) use of the

wires in furtherance of the scheme.  See U.S. v Reifler, 446 F.3d 65, 95 (2d Cir. 2006).

The jury could have reasonably found all of these elements as to Diamreyan.

A scheme to defraud "has been described as a plan to deprive a person of

something of value by trick, deceit, chicane or overreaching."  See U.S. v. Autuori, 212

F.3d 105, 115 (2d Cir. 2000).  The scheme-to-defraud element is given a broad

interpretation, including "everything designed to defraud by representations as to the

past or present, or suggestions and promises to the future."  See U.S. v. Altman, 48

F.3d 96, 101 (2d Cir. 1995)(quoting Durland v. U.S., 161 U.S. 306 (1896)).  As for the

6

second element, "where a necessary consequence of the scheme, if it were successful, would be injury to others, fraudulent intent may be inferred from the scheme itself." See Reifler, 466 F.3d at 96. The defendant is not contesting the third element. See Def.'s Mot. for J. of Acquittal at 8 n.4.

      A.    Count One

Diamreyan argues that, because Michael Pandelos did not testify, there was no evidence in the record about the phone call that forms the basis for Count One of the Indictment. See Def.'s Mot. at 5. Therefore, Diamreyan argues, the government could not sustain its burden of proof on this Count. See id. However, on a motion for judgment of acquittal, the government's "evidence must be viewed against the totality of the government's case." See U.S. v. Guadagna, 183 F.3d 122, 131 (2d Cir. 1999)(internal citations omitted). While it is true the government presented no direct evidence of the purpose of the call, it did present a great deal of circumstantial evidence. Antje Pandelos testified that people were making "promises" to her husband that he would be richly rewarded, and that he had no legitimate business nor friends in Africa, which is where the phone call originated from. The call originated from one of the telephone numbers listed by Diamreyan on his visa application. An inference can reasonably be drawn that Diamreyan himself was on the call.

Additionally, the government presented an email from an "Inspector Kofi" to Michael Pandelos on August 20, 2006, the day after the phone call listed in Count One, which tells Pandelos that "there is a change of name which you will use to make the payment to me" and directs Pandelos to make a payment to "Mike Okpako." Although this email did not come from the milkymyx@yahoo.com account, other emails from the

milkymyx account introduced into evidence with regard to Mitchell Bender included reference to a "Dr. Michael Koffi." In those emails, the phone number listed for "Dr. Koffi" is the x0246 number that Diamreyan listed as his. This is also the same number that placed the call to Pandelos on August 19, 2006. Finally, the government produced evidence from other victims that the scam perpetrated upon them included both phone calls and emails. There is more than enough circumstantial evidence in the record for the jury to conclude that the phone call listed in Count One was part of Diamreyan's scheme to defraud. The government's evidence on Count One was sufficient to support a reasonable determination that Diamreyan was guilty of wire fraud.

      B.    <u>Count Two</u>

      With regard to Count Two, Diamreyan argues there was "no evidence as to what scheme, if any, that $50 related to." <u>See</u> Def.'s Mem. at 6. Additionally, Diamreyan argues that there was no proof of his intent to defraud. <u>See id.</u> The government presented evidence from Antje Pandelos that she was sending money from Western Union because of "promises" of rich rewards made to her husband. Additionally, the government introduced the email from an "Inspector Kofi" to Michael Pandelos on August 20, 2006, directing him to make payment to "Mike Okpako." This email included on it, in Michael Pandelos's handwriting, "Replied 8/22." The wire transfer in Count 2 was made from Michael Pandelos to Mike Okpako on August 22, 2006. Therefore, there is evidence in the record sufficient for the jury to reasonably conclude that the payment was part of the scheme.

      The jury could have also considered the evidence from the other emails introduced from the milkymyx account and the testimony from Cotton, Bender, and

8

Smith as direct evidence of the scheme to defraud that Diamreyan was running.  The Second Circuit allows evidence of similar acts to prove a "continuing scheme."  See U.S. v. O'Connor, 580 F.2d 38, 41 (2d Cir. 1978).  Although this evidence did not include evidence about Diamreyan's communication with the Pandeloses, the scheme-to-defraud element is given a broad interpretation.  See Altman, 48 F.3d at 101.  The jury could have reasonably inferred that the Pandeloses were involved in the same scheme.

Diamreyan argues that there is no evidence of fraudulent intent with regard to this wire transfer.  See Def.'s Mot. at 6.  However, "where a necessary consequence of the scheme, if it were successful, would be injury to others, fraudulent intent may be inferred from the scheme itself."  See Reifler, 466 F.3d at 96.  Antje Pandelos testified that the communications with her husband continued until they no longer had any money.  Mitchell Bender and Richard Smith both testified that, although they sent money to Diamreyan, they never received anything in return.  Therefore, the necessary consequence of the scheme was injury to others.  In addition, the government introduced into evidence emails from Diamreyan's email account, which no one else had access to, in which he wrote to individuals under false names using false stories and false official-looking documents.  The government also introduced false documents found on Diamreyan's computer related to the emails that Smith received.  Thus, there was sufficient evidence in the record for the jury to conclude Diamreyan participated in the scheme with fraudulent intent.  On Count Two, the government's evidence was sufficient to support a reasonable determination that Diamreyan was guilty of wire fraud.

9

C.    Count Three

Diamreyan argues that there is no evidence in the record that Martine Janvier turned over the $100 wire transfer listed in Count Three to Diamreyan, and thus the government cannot satisfy the scheme and intent elements of the wire fraud statute. See Def.'s Mot. at 7. Diamreyan is incorrect. Janvier testified that Diamreyan told her to use that payment to pay his phone bill. On a motion for judgment of acquittal, the court must view the evidence in the light most favorable to the government. Therefore, the court assumes that the jury believed Janvier's testimony regarding that wire transfer. Additionally, the government provided supporting evidence in the form of an email from Diamreyan to Janvier, dated August 28, two days after the transfer was made, telling her to pick up a $100 transfer from Michael Pandelos and to hold it until he told her what to do with the money. For the reasons stated above with regard to Count Two, the government produced sufficient evidence for a jury to conclude that this wire transfer was part of a scheme to defraud and that Diamreyan had the requisite fraudulent intent. On Count Three, the government's evidence was sufficient to support a reasonable determination that Diamreyan was guilty of wire fraud.

IV.    **CONCLUSION**

For the foregoing reasons, Diamreyan's Motion for Judgment of Acquittal under Fed. R. Crim. P 29(c) (Doc. No. 49) is **DENIED**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 16th day of April, 2010.

 /s/ Janet C. Hall
Janet C. Hall
United States District Judge

10